IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| ELDRIDGE NICKSON, ET AL. | § | |
| VS. | § | CIVIL ACTION NO.   9:18-CV-172 |
| MELENDA COLE, ET AL. | § | |

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiffs filed this civil rights action pursuant to 42 U.S.C. § 1983, the Americans With Disabilities Act (ADA), and the Rehabilitation Act (RA) against Melenda Cole; Polk County, Texas; Kenneth Hammack; Brent Phillips; Anthony Clevenger; Felecia Jenkins; Douglas Skarpa; Jennifer Wright; and unidentified defendants.[1]

This action was referred to the magistrate judge pursuant to 28 U.S.C. § 636 for findings of fact, conclusions of law, and recommendations for the disposition of the case.

Defendants Melenda Cole and Polk County have filed an Amended Motion for Summary Judgment. This Report and Recommendation considers the merits of the Motion and Plaintiffs' Response.[2]

---

[1] The magistrate judge previously recommended dismissing the claims against Kenneth Hammack, Brent Phillips, Felecia Jenkins, Douglas Skarpa, Jennifer Wright and the unidentified defendants pursuant to Federal Rule of Civil Procedure 4(m).

[2] Defendants filed objections to Plaintiffs Response and a Motion to Exclude Expert Testimony, in which Defendants object to the admissibility of evidence. Rule 56 does not require the evidence presented at the summary judgment stage to be in a form that would be admissible at trial, as long as the party offering the evidence demonstrates that it can be put into an admissible form by the time of trial. *In re Deepwater Horizon*, 48 F.4th 378, 384-85 (5th Cir. 2022). The magistrate judge has considered all evidence that could be presented in an admissible form at trial.

Factual Background

Antwaun Bogany was thirty-two years old when he was arrested for controlled substance charges and booked into the Polk County Jail on August 29, 2016. While he was confined at the jail, Mr. Bogany suffered a stroke. On November 11, 2016, Mr. Bogany was transported to a local hospital. He was subsequently flown to the Kingwood Medical Center, where it was determined that Mr. Bogany was brain dead. At 9:51 p.m. on November 11, 2016, Plaintiff was pronounced dead. (Doc. #1 at 5-6.) The Montgomery County Forensic Administrator conducted an autopsy and found that Mr. Bogany's cause of death was an "intraparenchymal cerebellar hemorrhage due to hypertensive cardiovascular disease." (Doc. #84-1 at 37.)

The following time line of the events of November 10, and November 11, 2016, is quoted from the Undisputed Facts[3] section of Defendants' Motion for Summary Judgment:

**November 10, 2016**

8:30 p.m.    Antwaun Bogany was housed in Tank #195 with 15 other inmates at that time. Exhibit 1, Texas Ranger Report at 7. At approximately 8:30 p.m., Mr. Bogany (AKA: Doughboy) was exercising (doing pushups) inside the cell with two other inmates, when Mr. Bogany sat down and complained that his head was hurting. The inmates described that Mr. Bogany appeared to have overheated by overdoing the workout. Mr. Bogany vomited two or three times, complained that his head was hurting and had a confused look in his eyes. The inmates gave Mr. Bogany two Tylenol, a Gatorade drink and fanned Bogany in an attempt to cool him off. Mr. Bogany requested his fellow inmates [to] push the intercom button for assistance from jail staff. Mr. Bogany had made no prior complaints to the other inmates of being ill, and he had worked out multiple times prior to this incident. Jail Staff responded to Tank #195 within five to fifteen

---

[3] The facts are largely uncontested in this case. The time line provided by Defendants is supported by video surveillance, recorded telephone calls, and the Texas Ranger Report prepared following an independent investigation of the circumstances surrounding the death of Mr. Bogany. Defendants' Undisputed Facts section provides numerous cites to the record. Those cites are omitted from the quoted portions in this Report and Recommendation. To the extent that any facts are contested, the court accepts Plaintiffs' version of the facts at the summary judgment stage.

|  |  |
|---|---|
|  | minutes and wheeled Mr. Bogany out in a wheelchair. All of the inmates in Tank #195 were interviewed, and these facts were uncontested among the inmates. |
| 9:51 p.m. | Jail Staff entered Tank #195 with a wheelchair, and Jail Staff exited Tank #195 with Mr. Bogany sitting in the wheelchair. The front of Mr. Bogany's jumpsuit was opened and he was leaning on his right hand. |
| 9:54 p.m. | Mr. Bogany was positioned in a wheelchair on the southeast corner of the booking desk. |
| 9:56 p.m. | Mr. Bogany was moving around in the wheelchair and touching his head. |

(Doc. #84 at 2-3.)

Also at 9:56 p.m., Jailer Jennifer White contacted Defendant Cole by telephone. (Doc. #84-1 at 21.) During that call, Ms. White told Defendant Cole that Mr. Bogany had been working out an hour before, and that he had a really bad headache, was vomiting, felt really light-headed, was limp, and his eyes were rolling back in head, but he was "coming around a little bit." (Plaintiffs' Response to MSJ, Ex. C.) Ms. White said that other inmates thought Mr. Bogany "overdid it" and gave him Gatorade, and she said that it was warm in the tank. *Id.* Defendant Cole said it was a hard call to make because the symptoms could be caused by a number of scenarios, including a blood clot. Defendant Cole asked whether there was any other reason besides working out that could have caused Mr. Bogany's symptoms. Finally, Defendant Cole told Ms. White to put Mr. Bogany up front, watch him, check his blood pressure, and make sure the nausea and vomiting stopped. Defendant Cole said that if the nausea and vomiting did not stop, or if Mr. Bogany got worse, they should send him to the emergency room. *Id.*

Next, according to Defendants' Undisputed Facts, the following events occurred:

9:59 p.m.  Sgt. Clevenger pressed on Mr. Bogany's fingers as other jailers observe.

10:00-10:25 p.m.

Jail Staff made multiple efforts to get a blood pressure reading on Mr. Bogany. Sgt. Clevenger can be seen on the telephone at the booking desk until 10:26 p.m., at which time he hung up the phone and walked toward Mr. Bogany. During this time period, Sgt. Clevenger placed a phone call to Melenda Cole and spoke with her regarding Mr. Bogany. . . .

10:04 p.m.  Sgt. Clevenger gave Mr. Bogany water.

10:12 p.m.  Jailer Clamon completed a blood sugar test on Mr. Bogany.

10:24 p.m.  Sgt. Clevenger completed taking the pulse of Mr. Bogany manually.

10:27 p.m.  Sgt. Clevenger completed his telephone call to Melenda Cole and hung up the phone.

(Doc. #84 at 3.)

During the second telephone call to Defendant Cole, Defendant Clevenger told her that they could not get a blood pressure reading on Mr. Bogany, possibly because he was tensing up. (Response to MSJ, Ex. T.) Defendant Clevenger said that the blood pressure cuff worked because they were able to get a reading on other people, but they got error readings when they tried to take Mr. Bogany's blood pressure. Defendant Cole asked what symptoms Mr. Bogany was reporting at that time. Defendant Clevenger reported that Mr. Bogany had a headache, and Defendant Clevenger volunteered his opinion that Mr. Bogany might be dehydrated. Defendant Cole asked whether Mr. Bogany had been given Tylenol. Defendant Clevenger said that he did not know because he had just come on duty, but that he had been giving Mr. Bogany water and would give him Tylenol.

4

Defendant Clevenger said that, at that time, Mr. Bogany was reporting having a headache, and that he was light-headed, and dizzy. Defendant Clevenger again suggested that Mr. Bogany was dehydrated. Defendant Cole told Defendant Clevenger to give Mr. Bogany cool water and have him drink. Defendant Cole said that it would be difficult to get a blood pressure reading if Mr. Bogany was tensing up. Defendant Clevenger responded that he had taken Mr. Bogany's pulse manually, and it was a strong 80. At that point, Defendant Cole said that Mr. Bogany was probably fine, but she instructed Defendant Clevenger to send Mr. Bogany to the hospital if he got worse. She asked Defendant Clevenger to keep Mr. Bogany up front, and said they would check on him in the morning if he stayed the same. *Id*.

After the second telephone call, the following events occurred:

10:29 p.m.   Mr. Bogany was moving back and forth in the wheelchair grasping his head.

10:33 p.m.   Mr. Bogany is pushed in the wheelchair over to Cell #287 (the "padded cell"), he makes two attempts to get out of the wheelchair and fell firmly back in the chair each time, on the third attempt, Mr. Bogany did manage to stand up, but he then fell forward on his face in the cell, striking the floor of the cell hard.

11:13 p.m.   Sgt. Clevenger appeared to demonstrate Mr. Bogany's fall, to the other corrections officers.

**November 11, 2016**

1:45 a.m.   After 3 hours and 11 minutes, Mr. Bogany is wheeled backwards [from] the "Padded Cell" (Cell #287) to Tank #284. Mr. Bogany appeared non-responsive, laid back in the wheelchair, his orange jumpsuit draped over the front of his body, with both of his feet dragging on the floor.

1:49 a.m.   Sgt. Clevenger and two other detention officers picked Bogany up from the wheelchair and laid him on the floor area of Tank #284.

5

| | |
|---|---|
| 1:55 a.m. | Sgt. Clevenger taped a body camera to the exterior of Tank #284. |
| 2:41 a.m. | Sgt. Clevenger removed the body camera from the window. (NOTE: no video evidence from this time period could be recovered from Clevenger's body camera by the Texas Ranger or the Polk County Sheriff's Office Administration). |
| 4:23 a.m. | Captain Brent Phillips of the Polk County Sheriff's Office (the Jail Administrator and Sgt. Clevenger's boss) arrived in the booking area. This was Captain Phillips' normal time to arrive at the Sheriff's Office, and Sgt. Clevenger said nothing to Brent Phillips about Mr. Bogany having problems the night before, falling face first in the cell, urinating on himself or being non-responsive when moved from the padded cell to Cell #284. |
| 7:27 a.m. | Cole arrived at the booking area for work and checked on Mr. Bogany when she arrived that morning. Ms. Cole observed Mr. Bogany lying down on his mat with his eyes closed, and Mr. Bogany appeared to be sleeping normally. Cole spoke to Mr. Bogany, who moved his head and replied with a mumble. Cole believed that Mr. Bogany was tired or sleepy, and she told Mr. Bogany that she would return to speak to him when he woke up. Cole then requested that jail staff at the booking desk notify her when he woke up. |
| 7:30 a.m. | Licensed Vocational Nurse Wanda Standley arrived at the Polk County Jail and began her normal duties. Cole told Ms. Standley that Cole had been called by Jail Staff the night of 11-10-16 regarding Mr. Bogany. Cole told Nurse Standley that Cole had just checked on Mr. Bogany, and he was asleep. |
| 8:49 a.m. | At that time, approximately, Cole overheard Jail staff from the booking area requesting medical. Cole and Polk County Sheriff's Office Nurse Wanda Standley then entered Mr. Bogany's cell and observed him off his mat lying on the floor in his underwear. He was unable to sit up or move himself back onto his mat. He appeared dizzy and slow to respond. Mr. Bogany's eyes were making a jerking movement, and it appeared that Mr. Bogany had urinated on himself. Mr. Bogany appeared to have no control over his upper body. Cole asked Mr. Bogany if he had taken anything that he was not supposed to, and Mr. Bogany shook his head "no." Cole asked Mr. Bogany what happened, and he stated that he was exercising and his head started hurting. Nurse Standley asked where he was hurting, and Mr. Bogany raised his right hand and rubbed his forehead, eyes and nose |

|  |  |
|---|---|
|  | area. Nurse Standley requested Jail Staff to contact EMS personnel to transport Mr. Bogany to the hospital. |
| 9:02 a.m. | Cole and Nurse Standley left the cell and prepared the medical transfer documents and made copies of the medical records for EMS to take to the hospital with Mr. Bogany. Cole reviewed the records in the medical file while making copies, and Mr. Bogany had never made any medical requests or filed any medical complaints in the past. |

(Doc. #84 at 4-6.)

## Defendants' Amended Motion for Summary Judgment

Defendants Polk County and Melenda Cole contend that they are entitled to summary judgment with respect to the ADA and the RA claims because they allege Mr. Bogany was not disabled within the meaning of the statutes, and he was not discriminated against because of his medical condition or denied an accommodation. Defendant Cole asserts that she is entitled to qualified immunity, and that she was not deliberately indifferent to Mr. Bogany's serious medical needs. Defendant Polk County contends that Plaintiff failed to produce evidence supporting a claim for municipal liability.

## Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. PRO. 56(a). A fact is material if it could affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 427 (5th Cir. 2003). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Instone Travel Tech*, 334 F.3d at 427.

The party seeking summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003). After a proper motion for summary judgment is made, the non-movant must set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 994 F.3d 704, 708 (5th Cir. 2021); *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003).

<u>Analysis</u>

*I. Section 1983*

Title 42 U.S.C. § 1983 creates a cause of action against any person who, acting under color of state law, causes another to be deprived of a federally protected constitutional right. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Phillips v. Monroe Cnty.*, 311 F.3d 369, 373 (5th Cir. 2002). Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any state . . . subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws shall be liable to the party injured . . . .

42 U.S.C. § 1983. To state a cause of action under § 1983, a plaintiff must allege two elements. "First, the Plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." *Gomez*, 446 U.S. at 640.

*A. Qualified Immunity*

Defendant Cole contends that she is entitled to qualified immunity. The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When the defendant asserts a qualified immunity defense, the burden of proof at the summary judgment stage shifts to the plaintiff who must rebut the qualified immunity defense by establishing a genuine issue of material fact as to whether the defendant's actions violated clearly established law. *Luna v. Davis*, 59 F.4th 713, 715 (5th Cir. 2023).

Qualified immunity is intended to protect all officials, except those who are plainly incompetent or who knowingly violate the law. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Federal courts use a two-part test to determine whether the defendant is entitled to qualified immunity. *Freeman v. Texas Dep't of Crim. Just.*, 369 F.3d 854, 863 (5th Cir. 2004). The first prong of the test requires the court to determine whether Plaintiffs' allegations, if true, establish a constitutional violation. *Hope*, 536 U.S. at 736; *Freeman*, 369 F.3d at 863. If a constitutional right was violated, the court must decide whether the right was clearly established at the time of the violation. *Freeman*, 369 F.3d at 863. Clearly established rights should not be defined broadly. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light

9

of pre-existing law the unlawfulness must be apparent.'" *Hope*, 536 U.S. at 739 (*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The district court has discretion to decide which prong of the two-part test to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In this instance, the court will first determine whether Plaintiffs have established a violation of Mr. Bogany's constitutional rights under the Fourteenth Amendment.

### B. Deliberate Indifference to Serious Medical Needs

The Fourteenth Amendment ensures the safety of pretrial detainees, while the Eighth Amendment applies to convicted prisoners. *Baughman v. Hickman*, 935 F.3d 302, 306 (5th Cir. 2019). Because there is no significant distinction between detainees and convicted prisoners concerning their health and safety and medical care, the same standard applies to the constitutional claims of both categories of prisoners in cases involving episodic acts. *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001). "When the alleged unconstitutional conduct involves an episodic act or omission, the question is whether the state official acted with deliberate indifference to the inmate's constitutional rights, regardless of whether the individual is a pretrial detainee or state inmate." *Id*. An officer's failure to provide a detainee with immediate medical treatment is considered an episodic act or omission. *Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011). Therefore, the deliberate indifference standard applies.

The deliberate indifference standard is a subjective inquiry; Plaintiffs must establish that Defendant Cole was aware of an excessive risk to Mr. Bogany's health or safety, and consciously disregarded the risk. *Farmer v. Brennan*, 511 U.S. 825, 840-41 (1994); *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002). Deliberate indifference is an extremely high standard for Plaintiffs

to meet. *Baughman*, 935 F.3d at 307. Demonstrating that the defendant was negligent, committed medical malpractice or failed to act reasonably is not enough to show a constitutional violation. *Mace v. City of Palestine*, 333 F.3d 621, 626 (5th Cir. 2003); *see also Williams v. Hampton*, 797 F.3d 276, 280-81 (5th Cir. 2015) (noting that deliberate indifference requires a state of mind "more blameworthy" than negligence); *Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) ("It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference."); *Hall v. Thomas*, 190 F.3d 693, 697 (5th Cir. 1999) ("[A]llegations of malpractice or negligence will never state a claim under the Eighth Amendment."). Plaintiffs must show that the official conduct was wanton, which is defined as reckless. *Baughman*, 935 F.3d at 307. "[T]he plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Domino*, 239 F.3d at 756 (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

In this instance, it is clear that Mr. Bogany had a serious medical need, but it is not clear that Defendant Cole was aware that Mr. Bogany needed immediate medical attention from the information conveyed to her during the two telephone calls by members of the jail staff. Defendant Cole was a medical officer who assisted the medical staff at the jail, but was not a nurse or doctor herself. When she made suggestions regarding the care of Mr. Bogany, she relied on information that was relayed to her by Ms. Wright and Defendant Clevenger regarding Mr. Bogany's condition.

During the first telephone call, Ms. Wright told Defendant Cole that Mr. Bogany had a severe headache, was vomiting, felt light-headed, was limp, and his eyes were rolling back in head. In the same conversation, Ms. Wright said that the symptoms did not start until Mr. Bogany had

exercised in the warm cell and that he seemed to be improving. Although Defendant Cole wavered as to the correct course of action, she ultimately told Ms. Wright to watch Mr. Bogany and send him to the hospital if he got worse or if he was not better in an hour.

During the second telephone call, Defendant Clevenger said that Mr. Bogany had a headache, and that he was light-headed and dizzy. Although Defendant Clevenger stated that they were unable to get a blood pressure reading from Mr. Bogany, he told her it was due to Mr. Bogany tensing up when they were trying to get the reading. Defendant Clevenger also reported that Mr. Bogany's pulse was strong, and he twice offered his opinion that Mr. Bogany was merely dehydrated. Defendant Cole told Defendant Clevenger to watch Mr. Bogany and to send him to the hospital if he got worse.

After this conversation, the competent summary judgment evidence shows that Mr. Bogany got much worse. Although Mr. Bogany was unable to sit up in the wheelchair, he fell into a cell, and he urinated on himself, he was not sent to the hospital and nobody contacted Defendant Cole to advise her of Mr. Bogany's worsening condition. Further, there is no evidence that Defendant Cole was advised of the change in Mr. Bogany's medical condition when she arrived at work the next morning. Defendant Cole checked on Mr. Bogany when she arrived at work, but thought he was merely sleeping and asked members of the jail staff to let her know when he woke up. She also notified the nurse on duty that Mr. Bogany needed to be seen when he woke up. Almost an hour and a half later, Defendant Cole and the nurse went into Mr. Bogany's cell, saw his condition, and called for EMS to bring Mr. Bogany to the emergency room.

The competent summary judgment evidence is insufficient to create a genuine issue of material fact that Cole consciously disregarded a risk of harm to Plaintiff's health by failing to

advise the jailers on duty to send him to the hospital immediately. It is clear with the benefit of hindsight that Defendant Cole made the wrong decision to monitor Mr. Bogany's condition instead of immediately sending him to the hospital with tragic results, but her conduct does not rise to the level of egregious, intentional conduct required to satisfy the deliberate indifference standard. *See Gobert v. Caldwell*, 463 F.3d 339, 351 (5th Cir. 2006). Because Plaintiffs have not shown that Defendant Cole violated Mr. Bogany's clearly-established rights under the Fourteenth Amendment, she is entitled to qualified immunity.

### C. Municipal Liability

A governmental unit cannot be held liable for the acts of an employee solely on a theory of respondeat superior. *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986); *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985); *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978); *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009). A governmental unit may incur liability under § 1983 only for a deprivation of a constitutional right that is inflicted pursuant to an official policy or custom. *Monell*, 436 U.S. at 690-91. To establish liability, the plaintiff must identify the policymaker;[4] an official policy or absence of a policy; and a direct, causal link between the policy and the constitutional deprivation. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694); *see also Anderson v. Dallas Cnty.*, 286 F. App'x 850, 860-61 (5th Cir. 2008) (noting that the failure to enact policy despite the known or obvious consequence of a constitutional deprivation may result in municipal liability). "The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it

---

[4] It is undisputed that Kenneth Hammack, the Sheriff of Polk County at the time of Mr. Bogany's death, was the policymaker for Polk County. *See Turner v. Upton County*, 915 F.2d 133, 136 (5th Cir. 1990) (noting that the county sheriff acts as the policymaker for the county under Texas law).

must contain specific facts." *Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997).

An official policy must be either: (1) a policy that is adopted officially by lawmakers or by an official to whom the lawmakers have delegated policy-making authority, or (2) a persistent, widespread practice of city officials or employees which, although not adopted through official channels, is so common that it is accepted as official policy. *Armstrong v. Ashley*, 60 F.4th 262, 276 (5th Cir. 2023). Plaintiffs must show that the policy is either facially unconstitutional, or that it was adopted with deliberate indifference to the known or obvious consequences. *Piotrowski*, 237 F.3d at 579 (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 297, 405-07 (1997)). Because the deliberate indifference standard is a subjective inquiry, Plaintiffs must establish that the policymaker was aware of an excessive risk to the prisoner's health or safety, and yet consciously disregarded the risk. *Farmer*, 511 U.S. at 840-41; *Calhoun*, 312 F.3d at 734. Demonstrating that the policymaker was negligent or failed to act reasonably is not enough to show a constitutional violation. *Mace v. City of Palestine*, 333 F.3d 621, 626 (5th Cir. 2003). Deliberate indifference "must amount to an intentional choice, not merely an unintentionally negligent oversight." *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992).

Plaintiffs do not allege that there was an official, written policy adopted by policymakers to prevent jailers from sending prisoners to the hospital for medical treatment in emergency situations. The written policy, the Health Services Plan (doc. #84-16 at 6-9) provides that the medical, mental, or dental needs of prisoners which are brought to the attention of jail staff shall be brought to the attention of the jail medical officer for a determination as to the urgency of the problem. For routine care, the jail medical officer screens the prisoner to determine the appropriate

course of treatment and make referrals to providers. If there is a question as to the seriousness of the issue, it was required to be treated as an emergency, and the prisoner is transported to the local hospital emergency room for medical care. The written policy does not explicitly require the approval of the medical officer prior to transport for emergency care, but the shift supervisor or jail administrator must be notified if a prisoner is transported to the hospital. Additionally, a written memorandum regarding the policy for emergency medical situations, signed by Jail Administrator Brent Phillips, was posted in the jail. The memorandum states that certain medical conditions, including strokes, are medical emergencies requiring immediate attention. The memorandum goes on to say that EMS is to be contacted for those conditions, and EMS will make the determination whether to transport the prisoner to the hospital. The memorandum also states that the medical officer does not have to be contacted prior to calling EMS. (Doc. #84-16 at 11.)

     Defendant Polk County contends that the written policies concerning emergency medical treatment were not constitutionally-deficient. In response, Plaintiffs provided evidence that Mr. Phillips told members of the jail staff that they were required to consult with the medical staff before calling EMS or sending a prisoner to the hospital. Plaintiffs contend that Mr. Phillips' oral pronouncements, effectively amended the written policy, or constitute a custom or practice, requiring jail staff to consult with the medical staff prior to calling EMS in order to save Polk County money. Assuming that Mr. Phillips orally changed the policy or there was a widespread practice amounting to a policy, Plaintiffs failed to establish a causal link between the policy and Mr. Bogany's death. In this case, the medical officer was called twice. The first time, Defendant Cole told the jailer to send Mr. Bogany to the hospital if he was not better in an hour or if he got worse. During the second call, the symptoms relayed to her indicated that Mr. Bogany was improving, and

she told Defendant Clevenger to send Mr. Bogany to the hospital if he got worse. When Mr. Bogany's condition worsened after that second call, the jailers on duty already had the approval of the medical officer to call EMS, but they did not.

Plaintiff argues that Defendant Polk County was responsible for Mr. Bogany's death because the County failed to properly train employees. A claim for failure to train or supervise may be cognizable under § 1983 if Plaintiffs show: (1) the defendant failed to train or supervise his subordinates; (2) a causal link exists between the failure to train or supervise and the violation of Mr. Bogany's rights; and (3) the failure to train or supervise amounts to deliberate indifference. *Mesa v. Prejean*, 543 F.3d 264, 274 (5th Cir. 2008). A single instance of lack of training or supervision is generally not sufficient to demonstrate deliberate indifference.[5]  *Id*. A defendant cannot be held liable based on general allegations that the injury could have been prevented if the employees had received better or additional training. *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005). Rather, Plaintiffs must demonstrate, with specificity, how a particular training program is defective. *Id.* General claims of subpar training are insufficient to show the defendant acted with deliberate indifference. *Armstrong*, 60 F.4th at 277.

The competent summary judgment evidence reflects that all Polk County jail employees met the training requirements set by Texas law. The United States Court of Appeals for the Fifth Circuit has held that, when law enforcement officers have received the training required by Texas law, the plaintiff must show that the legal minimum amount of training was inadequate. *Sanders-Burns v.*

---

[5] Plaintiffs point to three additional in-custody deaths as evidence that Mr. Bogany's death was not an isolated occurrence. Two of the deaths were suicides that occurred after Mr. Bogany's death. Nathan King died almost two years before Mr. Bogany. On February 4, 2015, Mr. King reported that he had fallen and could not walk, and he was sent to the hospital that same day. On February 22, 2015, Mr. King died at the hospital of pulmonary tuberculosis. Mr. King's death does not present similar circumstances as the death of Mr. Bogany.

*City of Plano*, 594 F.3d 366, 381-82 (5th Cir. 2010). However, Plaintiffs have offered no evidence demonstrating that the minimum training required by the State of Texas is inadequate.

Viewing the evidence in the light most favorable to Plaintiffs, there are no genuine disputes of material fact. Plaintiffs have failed to establish that Polk County's policies or training of staff violated Mr. Bogany's constitutional rights.

## II. Americans With Disabilities Act and Rehabilitation Act

Plaintiffs claim Defendants Polk County, Cole, and Clevenger violated Mr. Bogany's rights under the ADA and RA. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The language of the ADA generally tracks the language of the RA, which was designed to prevent an individual with a disability from being denied jobs or other benefits solely because of the disability. *Delano-Pyle v. Victoria County*, 302 F.3d 567, 574 (5th Cir. 2002). The ADA provides that the remedies, procedures and rights available for an ADA claim are the same as those available under the RA. *Id*. As a result, the jurisprudence interpreting either statute applies to both statutes. *Hainze v. Richards*, 207 F.3d 795, 700 (5th Cir. 2000).

To establish a prima facie case for discrimination under the ADA or the RA, Plaintiffs must show that Mr. Bogany had a disability, he was qualified for a benefit, and he was denied the benefit because of his disability. *Ivy v. Jones*, 192 F.3d 514, 516 (5th Cir. 1999). With respect to the first element, the ADA defines the term disability as: (1) a mental or physical impairment that substantially limits one or more major life activities of an individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2). In this

17

case, Plaintiffs contend that Mr. Bogany's hypertension was a qualifying disability, and that he qualified for the benefit of medical treatment. Plaintiffs failed to provide any evidence to support a claim that Mr. Bogany was denied medical treatment because he suffered from hypertension, or that Defendants were even aware that he suffered from hypertension. Thus, the competent summary judgment evidence does not support a claim of discrimination.

In addition to banning discrimination against disabled individuals, the ADA requires public entities to make reasonable accommodations for them. *Tennessee v. Lane*, 541 U.S. 509, 531 (2004). To state a claim under the ADA for failing to accommodate, Plaintiffs must prove that: (1) Mr. Bogany had a qualifying disability; (2) the public entity knew about the disability and Mr. Bogany's limitations, either because he requested an accommodation or the limitation was obvious; and (3) the public entity failed to make reasonable accommodations. *Smith v. Harris Cnty.*, 956 F.3d 311, 317 (5th Cir. 2020); *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723-24 (5th Cir. 2020). An accommodation is reasonable if it does not impose an undue financial or administrative burden on the public entity or alter the nature of the service or program in a fundamental way. *Smith*, 956 F.3d at 317.

Defendants contend that Mr. Bogany's hypertension was not a disability, as defined by the ADA or RA, because it did not substantially limit a major life activity. In response, Plaintiffs argue that Mr. Bogany's stroke constituted a disability. There is no evidence in the record that Defendants were aware that Mr. Bogany suffered from hypertension, or that they were aware that he had suffered a stroke prior to the time that EMS was called. Further, there is no evidence that Mr. Bogany was denied services, programs, activities, or accommodations because he had hypertension or suffered a stroke. Finally, a plaintiff asserting a private cause of action may only recover

compensatory damages by proving intentional discrimination. *Delano-Pyle*, 302 F.3d at 574. In this case, Plaintiffs would not be able to recover compensatory damages because they failed to demonstrate intentional discrimination by Polk County.

## Recommendation

Defendants' Amended Motion for Summary Judgment, filed by Defendants Melenda Cole and Polk County, should be granted.

## Objections

Within fourteen days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings of facts, conclusions of law and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

Failure to file written objections to the proposed findings of facts, conclusions of law and recommendations contained within this report within fourteen days after service shall bar an aggrieved party from the entitlement of *de novo* review by the district court of the proposed findings, conclusions and recommendations and from appellate review of factual findings and legal conclusions accepted by the district court except on grounds of plain error. *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72.

SIGNED this 14th day of March, 2023.

_____
Zack Hawthorn
United States Magistrate Judge